Case number 15-1500, Nueva Esperanza, Inc. Appellant v. Federal Communications Commission Ms. Rowell for the appellant, Mr. Nolak for the appellee Good morning Good morning Your Honor May it please the Court This case turns on the proper interpretation of the FCC statement which prohibits groups from colluding to agree to share time and points before the mutually exclusive phase of the low-power FM application process Now, the FCC agrees that the statement includes this prohibition but reads the prohibition to apply to only a very narrow subset of circumstances That limitation is irrational and does not comport either with the policy behind the statement and the low-power FM system or with common sense If I may start with addressing the Commission's argument The fourth paragraph of the statement includes the clear language that Can I just, instead of starting with the fourth, can you start with the third? Which is that, so, what is it, let's just assume the fourth doesn't even exist If you just look at the third, what is it about the third that doesn't cover this case? So, the third paragraph is permissive It says that groups may apply knowing that they may decide later to aggregate points so they can negotiate a timeshare agreement So, the proper reading of the third paragraph is that Entities enter into the low-power FM licensing application system knowing the rules Knowing that once the Commission has awarded points and if groups are tied at that point They can then enter into time and point-sharing agreements to get rid of the tie So, groups, of course, can go into the process knowing that there's a point in time down the road where they may then decide to share points But we don't think that this says that they can go into the process with an agreement already inked So, suppose if the fourth paragraph doesn't exist at all and we're only talking about the third Do you read the third to preclude the possibility that you can't have an ex-ante agreement? We think the third is consistent with the notion that you can't have an ex-ante agreement You can have an ex-ante No, we think it's consistent with our argument that you can't, however Cannot Cannot But if the fourth paragraph doesn't exist, we don't think It's not our argument that the third paragraph alone gets us where we need to go So, it sounds like basically the way you're reading the third is to say You can know that you can agree later That's right But you just can't act on your knowledge ahead of time by having an understanding that, look, if it turns out we're all tied at the end of the day here's how we could think about apportioning the tie That's our reading of the third and fourth paragraph and how to read the statement as a whole to make it consistent What sense would it make for the agency to draw that kind of distinction if it wants to allow for the possibility and indeed promote the possibility that in the event of a tie, there's going to be an apportionment that's going to be agreed upon and mutual agreement is a good thing and we want to promote that Why would the agency say, by the way, don't even talk about it beforehand Wait to see what happens and then if you get tied, you can enter into an agreement But beforehand, it's verboten So first, that line is one that the FCC has drawn clearly in this statement In the fourth paragraph, it says groups can't apply with a prior understanding that they'll share the kind of ties I'm not worried about what the fourth paragraph says I know you want to get there and I can understand why you want to get there But why just as a matter of common sense Suppose the agency just completely misspoke in the fourth Why would it want to do that? What sense would it make to draw that distinction? So the ultimate purpose of the Low Power FM scheme as a whole is to increase the diversity of voices on the airwaves And saying that groups can't enter into the application process with a pre-existing agreement to share time and points promotes this diversity of voices being able to eventually enter the winning group and receive the license How? So the facts of this case are a good example So the Germantown entities all represent Germantown which is a 3.3 square mile part of northwest Philadelphia They all have very similar interests Now Esperanza represents the Hispanic community in Philadelphia The NAACP, you know, we're interested in putting voices on the radio to promote racial justice These are interests that are different than the interests of the Germantown entities So if you draw a line and say you can't have an agreement to share time and points at the application phase what it does is it allows for these other groups to have a good shot at entering into the final timesharing agreement that wins Is that what happened here? What happened here is Not everyone in the original was deemed eligible Someone that was, I think, dropped out and another party that was not came in That's right But the three entities, the three Germantown entities from the beginning three out of the four are the same that entered into the ultimate timeshare agreement in this case And so what that meant, because there were seven, all you needed was four That means there was only one spot open essentially for other entrants to come in Had there not been an agreement at all then all of the seven entities would have had an equal opportunity But there were, I believe, 11 at one point, were there not? So that locking up four didn't give any assurance of having a majority? There were more than seven applicants at the initial phase The way the process works is the FCC looks at the applications and awards points and makes sure everyone is technically complying with the application requirements So once they get to the phase of awarding points there were seven entities And then there's a 90-day period where the group But this understanding would have preceded that, correct? That's right, it preceded the application So you were saying that in that preceding period they could somehow assure themselves of a majority? Well, they had a better chance of assuring themselves of a majority because they had an agreement It wasn't a done deal, of course, because So why does it in any way frustrate the agency's policy of inviting a diversity of voices? Because in this situation they did, in fact, those four entities could have, in fact, locked down the As it turned out Yes, as it turned out Not ex-ante Ex-ante, right Ex-ante, what happened was the agreement made it more likely that those groups would prevail and less likely that Esperanza and NAACP Oh, that would make it more likely they would prevail Because they have a group of four So regardless of how Okay, not more likely that they would be deemed eligible No, I'm sorry No, more likely they would actually receive the license which is what we were concerned about and that's what the FCC is concerned about But the whole thing is contingent on the possibility that they end up in a tie, right? Because if you're not one of the entities that ends up in a If you're not one of the applicants that ends up in the tie you're out of the mix, period You're You should be out of the mix What the FCC and if I may address the fourth paragraph because it's relevant to your question The FCC reads the fourth paragraph which explicitly prohibits groups from entering into agreements to share time and points They read the fourth paragraph as limited to situations where if just one applicant of that group succeeds in getting through to the final stage So A, B, and C reach an agreement A gets through and B and C are piggybacked onto that agreement That's the one situation in which the commission acknowledges that this statement creates a rule of no ex-ante agreements That That we think is an example of a situation in which you can't have ex-ante agreements but can't be read as an exclusive situation A list of all the situations in which that is the case So here's a good example A, B, and C again If A and B get through to the final phase but C does not C would get piggybacked in the same way as in the commission's hypothetical but that's no less of a concern of C getting piggybacked with A and B versus B and C getting piggybacked with A The same concerns are at play here but only the if just one applicant succeeds if that language is read literally and as an exclusive list then the scenario that I put forth is not covered and the commission's goals are thwarted in that situation as opposed to the very similar one Did you just say then that even if C is determined not to be eligible it can come back into the group? Well, that's what the commission wants to prohibit That's one Yeah, okay with the fourth paragraph That's one of the concerns and the reason is because I mean, so we talked about the diversity of voices There's also the commission wants to have strong entities actually receiving the license and getting airtime and the reason for that is because these are highly sought after licenses and you want the you want entities to actually be operating these these these stations What happened in this case is that G-Town Radio went to its friends other entities in Germantown and said look, you guys should apply for this low-power license you can apply separately we have these sort of overlapping board structures but we all represent Germantown we'll apply separately and then if we all get through we'll share time and points and that's exactly what happened here But everyone has to be capable of operating even if they're the only one That is a requirement of applying All of the groups listed It's not as if somebody who couldn't really operate is being brought into the group There's no evidence of that in this case but we don't It wouldn't be allowed It couldn't happen, I don't think, right? That's right, I believe that's correct So but the example the gamesmanship concerns in the fourth paragraph which are clearly spelled out here multiple groups should not attempt to maximize their chances of receiving the permit by submitting multiple applications those gamesmanship concerns are at play in not just the if just one applicant succeeds scenario they're at play in the if two applicants succeed or they're at play in the situation in this case where it turns out that all of the groups in the pre-existing arrangement get through because they increase their chances that that group with the pre-existing arrangement will ultimately get the license to the exclusion of other groups that, as deemed by the Commission are equally able to operate and have received the same number of points Is it fair to read if just one applicant succeeds as meaning if less than all succeed? We don't think that that's the proper And it's literally only if one succeeds? No, it can't be if just one for the reason I said if A and B go through and C doesn't the same exact concerns are at play as if A gets through and B and C are piggybacked in but if you're going to rewrite the sentence which you have to do to have it make any sense to have it be a rational assertion of the agency's stated goals in this paragraph which is maximizing the chances of receiving the permit and of promoting the diversity on the airways If I may turn to the issue of whether this guidance is authoritative and binding because I'm sure my colleague will raise this issue This statement was clearly directed at the entrance into the low-power FM system It is a list of do's and don'ts It tells them what they can do and what they must not do It appeared on the FCC's official website under the authorship of Bill Lake the chief of the Media Bureau Mr. Lake is designated by the regulations to have the same authority that the Media Bureau itself has so he clearly had the authority to bind the agency as a whole This court's precedent says that there's no I mean, it's clear that there's no medium that is or isn't authoritative The court just needs to look at the indicia of authoritativeness on the face of the document and we think that this document has all of those indicia It can't be the case that the agencies are able to put up guidance on the internet when it's convenient for them because of cost-saving and because this is the way that people interact nowadays but then back away from that same guidance on the internet when it's convenient for them by saying, oh, well, we didn't go through notice and comment so it can't possibly be a binding rule If I may, if there are no further questions I'll reserve my remaining time Good morning, your honors and may it please the court I'm Scott Novick for the FCC I'd like to begin by walking through what the staff blog post here actually says because I do think Esperanza is taking a single sentence of this blog post out of context and misrepresenting what it means As Judge Srinivasan recognized, there are two paragraphs of this blog post that are potentially relevant here and they each deal with two very different kinds of agreements So the paragraph beginning with third deals with time-sharing agreements and what that paragraph says is that organizations in a community could apply separately knowing they may later decide to aggregate points so they can negotiate a time-sharing agreement if the commission determines they're tied with the highest point total and that's essentially what happened here The time-share applicants chose to file separate applications knowing they would then be allowed to enter into a time-sharing agreement and aggregate points and the blog post specifically allows this So what about the response on the other side which is that it doesn't expressly sanction entering into an agreement before everybody's been determined to be tied and therefore, I forget what the term is for the... Tentative selectee Tentative selectee, right So before you're a tentative selectee what it's talking about is that you can go into it individually knowing that in the event of a tie you could later enter into an agreement but that doesn't tell you that you're authorized to engage in those kinds of negotiations and agreements ex-ante So I want to respond to that in two or three different ways and I hope I'll have the opportunity to elaborate on each of them One good one is... Yes, we'll do it Well, Judge Ginsburg I think the first point goes to something that Your Honor observed earlier which is even if we were to draw a line between knowledge or plans or discussions on the one hand and quote-unquote agreements on the other hand Esperanza wouldn't be helped here because Esperanza hasn't shown that there was an agreement here hasn't shown there was any final agreement between the winning applicants when they applied What Esperanza alleged is an agreement between one set of applicants but the winning timeshare agreement was between a different set of applicants and I think the fact that a different agreement was negotiated later demonstrates there was no concrete agreement in place earlier I would also direct Your Honor as to page 140 of the joint appendix where the Germantown applicants say here's what we did and they say applicants recognized their best chance was by working together at the outset with plans to potentially aggregate points during the mutually exclusive stage so that is exactly what the blog post says I don't think there was an agreement here I understand why Esperanza wants to say there was an agreement but I think that a quote-unquote agreement which was apparently still malleable and the parties were still free to change their minds later isn't really an agreement at all So go past that one and then suppose there's the conceptual question whether you can enter into an agreement Yes, so our view, Your Honor and this is my second point is that we don't draw any line and we have never drawn a line and you won't find one anywhere in the LPFM rules between discussions and agreements and I think it would be problematic to do so because we would essentially have to try to read the parties' minds in every case to try to figure out assuming on Esperanza's view that an agreement doesn't have to be a final enforceable agreement we would have to read the parties' minds to try to figure out at what point did any discussions mature enough to cross some intangible line into being an agreement Let me go back to your first point because this raises a question Suppose that the four parties entered into a firm agreement that if any of them succeeds those who succeed will agree to share time and will invite anyone else who has succeeded to join a firm agreement That's not a problem? So Your Honor my first response to that is that under our rules we wouldn't respect any agreement until after the tentative selectees are announced So as far as we're concerned that wouldn't have any effect under our rules I guess we're trying to understand the real world here If you want diversity you can't have people deciding against diversity in advance and then ultimately winning because that means the non-diverse people are locked out Alright? And I don't know enough about Germantown to know what's going on here but just reading the record that's before me So that theoretically is what the concern is here And we can all from our own experience think of examples where exactly this happens So the argument is if you have a policy in favor of diversity you ought to let anybody apply see who's qualified and then the agreements take place not lock them up beforehand And I gather that the commission subsequently has decided that what it calls game leadership is okay and that's a policy decision by the commission But at least I understood the petition to say in very strong words it doesn't make any sense if indeed it has this other policy favoring diversity Your Honor our stated goals for the LPFM service do include diversity and localism but those aren't the only goals and we're not pursuing them at all costs Among other things we want to be able to get these licenses out quickly into the hands of people who can cooperate effectively together And so we don't want to go back to the era of having to do comparative hearings to try to measure which group is the most diverse We established a point system which attempts to quickly and objectively measure through various proxies diversity And as far as our system is concerned if applicants are entitled to the same number to a given number of points they receive those points that's how we measure diversity without trying to inspect well So it doesn't matter in Germantown if all the FM stations are playing country music So it would still be consistent with the policy and the point system It would, Your Honor Now, it's a little simpler here because No, but I mean that's the result of what the commission has done Yes, so what So all over the country we will be hearing nothing wrong with country music but I'm just saying that we'll be hearing country music Your Honor I think what mitigates that concern is that in order to receive in this case the five points that each of these applicants received they need among other things to have had an established community presence for at least two years and they need to be separate organizations that are under separate control I do want to be clear here These organizations are not ones that just cropped up to apply for this Germantown life dates back to 1950 I know, but it doesn't matter under the commission's approach Your Honor There are country music stations everywhere Alright And if you're talking about diversity doesn't the commission have to consider what the product is? I mean, otherwise there is no potentially no diversity So what we require is that the organizations be separate organizations that have their own established mission statement and that they have an established presence as individual organizations Now we are not going to inspect to try to figure out because I think this would go back to the era of comparative hearings where we'd have a difficult system to administer and wouldn't be able to do quickly and objectively So what I'm trying to understand is how do you avoid having all the stations with country music? If somebody decides to fund country music and sets up all these organizations under your system there is no diversity Isn't that the point? Well, under that scenario I mean, I think this is kind of far out because among other things the LPFM rules don't allow an owner of an LPFM station to have an attributable interest in another station So if you had someone who was establishing several different stations and there was some overlap That's not my hypothetical We all know country music is throughout the country Okay? Different forms of country music And if you're talking about diversity presumably we want to hear some classical music every now and then or something like that I mean, I'm trying to make this as neutral as possible even though I don't think that's what's happening here But the way you're describing the process it doesn't promote what the commission says it's interested in promoting because everybody can figure out a way as your rulemaking engagement ship points out to beat the diversity point So what I think that rulemaking recognized is that if you're going to have a point system if we're not going to go back to the era of long drawn out subjective comparative hearings there's always going to be some remote possibility some remote scenario you might be able to envision where someone might look at the end result and not think that it is Well, for example you could have a point system that says if this region of five square miles already has two country music state low power FM stations a third low MF station applicant has to offer something else So this ultimately was a policy cut by the commission Right You could have that system we're not denying that but you would have difficulty administering that system in the way that we feel best serves our goals which includes being objective and easily being able to quickly administer licenses Okay, but I just gave you an objective point system Yes, your honor And I'm just trying to understand the commission's position here If you have a point system that has nothing to do with diversity of product much less offeror how do you promote diversity? So I think we have difficulty administering that system because of course I know you want to go back to the problems of comparative hearings but I'm suggesting there's another way to do it So your honor I mean we could have a rule that says you know in a very concrete low level of generality you can't have more than one country music station but suppose we had a rule that said you can't have more than one station that has similar programming Well how do we measure what similar programming No counsel, it's very easy level of generality I was being very specific I don't want a single out country music but that was just an easy example When I turn on my car radio for example I can find all kinds of music on the FM station but the way the commission has set it up five years from now I may be hearing only one type that's all I'm getting at I don't see how the system itself promotes diversity Maybe I'm mistaken I thought we were talking about diversity of programming in the course of the day Yes your honor All the commercial stations continue to exist all the existing non-profits these low power supplements your expectation is well if we have a bunch of community organizations rather than fewer or at least rather than one we will likely elicit diversity of programming So you could have an option but that doesn't work if you're trying to enlist organizations like this you could have a comparative hearing but that doesn't work for anybody and has long been proven inefficient and so you're taking a reasonable inference that multiple organizations will have different points of view Yes yes and our view is that we think for those reasons that LPFM stations given the non-commercial nature and how this is designed will generally have different programming than what's already on commercial stations What was your third risk because the first one was that there wasn't any ex-ante agreement here at all the second one was if you tried to draw a distinction between discussions and agreements that would be inadministrable Your Honor You had a third response Could I just quickly return to Judge Rogers' question before turning back to that That's fine So Judge Rogers our submission here there are two last points that I want to make so one is our basic submission that ultimately we need an objective system here and there would be difficult cases at the margins if we were to do things differently and that was a policy call and the other point that I want to make is that if you have a community that is sustaining multiple independent long-standing stations that have similar content I don't know there would be the worst thing in the world to say well there's a demand for that content in this community and maybe it's okay to have those on there Now our preference is generally for diversity but we're balancing against other goals here Now Judge Srinivasan Yes, so my response to this question about whether this falls within the language of the third paragraph here So my first response is that there simply isn't an agreement on this record And my second response was that You don't want to do administer the line between this kind of agreement We don't want to administer the line and our system happens to happily avoid that problem And what's the third response The third response is that even if the court isn't sure whether this falls strictly within the word of that third paragraph it certainly doesn't fall under the fourth paragraph which is what Esperanza is trying to rely on and the juxtaposition of those two matters So in the paragraph beginning with fourth which is the one that Esperanza is focusing on here The blog post says that groups can't file separate applications if there is a prior understanding that the groups will later share time or ownership if just one applicant succeeds in getting a license And that paragraph forbids what I refer to as piggybacking agreements Agreements that allow an organization that isn't a tentative selectee to piggyback on a winning applicant and to share in its airtime And that would violate the rule that only tentative selectees can share in an LPFM patient's airtime So beforehand they don't know if they're a tentative selectee Yes But the way you're phrasing it you're saying you're assuming that they are a tentative selectee So these piggybacking agreements are I think agreements that would say essentially I say to you if I win this license and even if you aren't a tentative selectee as well I will nonetheless let you put some of your programming on my airtime And that violates that rule about only tentative selectees sharing the station's airtime And it also violates the requirement to disclose all real parties and interests who have control over a station's airtime And if you look at the rest of the fourth paragraph and this is juxtaposing the third paragraph with the fourth paragraph we have here is a time-sharing agreement in which all of the applicants have to be tentative selectees So it's okay in other words it's okay under the third paragraph to have an agreement if the agreement is conditioned on all the agreeers being tentative selectees It's not okay to have an agreement that expands beyond that and allocates share time even to somebody who's not going to become a tentative selectee Yes your honor that's how the commission has interpreted our rules here Now I don't think that scenario is presented for the reasons that we already discussed I don't think there was an agreement    blog post and the commission So I think in our rules we have never drawn any distinction between knowledge or discussion and agreements This is in our view we wouldn't draw any line between this and what's in the third section of the rules So there are a few different scenarios which we lay out in detail in our brief and it does go I think to the court recognized earlier this ex-ante ex-post distinction what information you have available when So I can imagine a scenario where stations A and B are both applying for an LPFM license and they don't know for certain because there's limited information available at that time that they will be tied they will both be tended to select T's So you can imagine reciprocal piggybacking agreements they just want to make sure they have a chance to each get some of their programming on the airtime and A says to B if I'm the sole winner I will let you have some of your programming on my airtime in exchange for B agreeing with A that if B is the sole winner it will let A have some of its airtime Why does that improve the chance of getting an LPFM permit? Because it improves the chances that  It doesn't seem to me it improves the chances of getting a permit it might improve the chances that they get some benefit of a permit from airtime later So there's a terminological issue here and it's easiest to see when we talk about timeshare applications so when if you have a timeshare and there's two or three or four stations the terminology we use is not that each one of them gets a share of the license each gets an individual license now that license may be limited to only a share of the airtime but each has a license so the scenario that I'm discussing with these piggybacking agreements would be functionally equivalent to each station having a license each having a chunk of time in which you can No but having a license having a chunk of time I'm just quibbling with this word just so I make sure I understand your argument the words are maximize the chances of receiving a construction permit and the scenario you outlined which is the one I understand which is A and B get together and say look I don't know if we're going to have an allocation of 50 50 on airtime how does that improve the chances of getting a permit I take your honor's point that maybe in retrospect that could have been worded slightly differently to say maximize the chances of being allocated a construction permit and the scenario you outlined which is A and get together and say maximize the chances of getting of getting a permit A and B  and  maximize the chances of getting a permit A and B get ル and B get together  say maximize the chances get together and say A get together So just to start, where opposing counsel concluded, this court does not need to reach any sort of broad opinion about the nature of Internet guidance as a whole. And there's nothing in the way that this court should write an opinion that would have any bearing on any agency's ability to communicate with the public. So let's just take that off the table. As a factual matter, all of the entities received five points, and the only reason that Esperanza was not able to receive the license was because of this prior arrangement. So we were harmed in that way. Judge Trinabasan, you pointed out that, in fact, the only situation in which anyone's chances of receiving a permit are increased by any sort of pre-existing agreement to share points is in a situation where all of the entities do make it through to the final round. And so if you're to put any meaning on this chances of maximizing the ability to receive the permit, it needs to apply to our situation where everyone goes through to this round. In fact, opposing counsel acknowledges that you can't limit the application of the fourth paragraph to, as it says, if just one applicant succeeds in getting a construction permit and would adopt a broader reading of it. We're not taking issue with the point system. The point system is fine. The problem is like-minded groups getting together to gain an advantage in this situation. There was an agreement reached in this case. We think that that's adequately alleged. Yes, the commission did not reach a finding either way on whether there was an agreement. It just said, it doesn't say what you think it says, and anyway, it's not binding. So we think that the court should find for us vacant and remand to the commission for additional fact-finding, if necessary, on the question of whether an agreement was reached. But we think there's sufficient evidence here. Excuse me, if we agreed with the commission that it doesn't say what you think it says, then it doesn't matter whether it's binding, correct? That's correct. This is not going to require the commission in the future to wade into these sticky questions of whether an agreement was reached or not reached, what point up until agreement you can go, because there was an agreement in this case and that's all we're asking the court to find. We think that's consistent with the commission's regulations, which provide that you can only submit a timesharing agreement after the mutually exclusive stage begins. But wouldn't the upshot of your... I mean, it's of course true that one can write an opinion that doesn't require, in this case, policing the line between discussions and agreements, but isn't the upshot of your position that under the third paragraph, you can enter into discussions, but you can't get to the point of an agreement? And in which case, if that were the policy, that's what the FCC would have to do? So that sheds light on whether that's in fact what the third paragraph means. Right. So we think that's an appropriate reading of the third paragraph, but not a necessary reading of the third paragraph, because you can just read the third paragraph to say, essentially, they may decide later, meaning the entities enter into this agreement or into this process knowing that they may team up with other people, but it doesn't necessarily mean that they've already had communications to that effect. But then that would mean that they can't have any... I mean, in other words, it's true that the third paragraph could be read to mean they may decide later. That leaves a big question unanswered, which is what can they do in anticipation of the fact that they may decide later? Right. And we don't think the court needs to reach that, but it is consistent with our position that entities can discuss sort of vaguely the idea that, yes, there is this later stage, and potentially we would share time and points with you or maybe with these other people. That's totally consistent with our position. In fact, there's a public notice in this case that the SEC cites at page 9 of their brief, which says that mutually exclusive applicants may communicate with each other at any time before or after that mutually exclusive phase, and they put a lot of stock on that. But all we think that says is once you have applied, then you can necessarily talk to people. So we don't think that that's a requirement of an opinion finding for us in this case. So the FCC's concern is with piggybacking of groups that wouldn't otherwise necessarily get the permit, and we think that that concern equally applies in our case as it does in the if-just-one situation or if the one-or-more situation gets through. Just very briefly on Malkin, we think this case is very much distinguishable from Malkin. In Malkin, all we knew is that it was an FCC insider, which would just describe essentially anyone who works at the FCC. And as Judge Rogers points out, the guidance here was by Bill Lake, chief of the media bureau. His position was noted very prominently in the statement itself. That the statement is written as opposed to oral, we think adds additional weight and authoritativeness to the statement. This was not an off-the-cuff remark. This was written in a blog post, which we can presume went through some sort of vetting before it's posted on the FCC's official website. Yes? If, to go back a bit and then go forward, if we think that it doesn't mean what you think it means, and it doesn't matter whether it's binding, does it also not matter whether it's clear to you? Clear or not? So if you disagree, if you accept the FCC's reading, which obviously we think is irrational and incorrect, if you accept that reading, we still have a preserved fair notice argument, which is an alternative argument we made both here and, as Judge Rogers points out, before the commission. Where essentially, if it means, if their reading is, their reading can't be clear either way, essentially. Opposing counsel already said that you can't read if just one applicant succeeds to mean if just one applicant succeeds. So if it's not clearly, if our interpretation is not correct, then it's at least ambiguous enough that we think we have concerns of fair notice. And that is essentially, entities go to the FCC's website. These are, as Judge Rogers points out, not particularly sophisticated. They're local entities. They go to the FCC's website, and they receive information on the low-power FM application process. If they read, if our reading is not correct, then the third and fourth paragraphs essentially make no sense and could, and it is rational for us to have assumed that we couldn't enter into these preexisting agreements, had we known. I mean, that seems a little, it's a little bit of a tricky position for you, because if the notice is completely ambiguous, then it doesn't seem to me, it's hard to rely on something that's completely ambiguous to preclude you from doing something that, as to which is ambiguous. Right? It's ambiguous enough that the Germantown entities thought it was acceptable to do what they did, and we thought it was unacceptable. There's a reading that it's acceptable and unacceptable, so this is akin to, there's a case that is in our briefs, the Satellite Broadcasting Company case, where they were supposed to file in Gettysburg, but they filed in Washington, D.C., and it was equally plausible. The court describes these situations where X or Y could be the reading as playing Russian roulette. Essentially, you're, a group is staking their ability to, a group is interacting with the commission, thinking X is correct when in fact Y is correct, and, but the text of the regulations in that case and the statement in this case could equally apply to either reading. And so we can't be penalized from, for our totally reasonable reading of the statement. And we were penalized because had we known that it was acceptable, assuming of course this court does think it's acceptable to come to these agreements, which, meaning we've lost our primary argument, then had we known that it was acceptable, we would have reached out to these other groups and potentially entered into this winning group of four. Before the mutually exclusive phase of the process. Anything further? No, we would just ask this court to vacate the commission's order and remand to the commission for the appropriate remedy. Thank you. We'll take the case under advisement.
judges: Rogers, Srinivasan, Ginsburg